UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

HANAA KHUDHAIR                                                    PLAINTIFF

v.                                          CIVIL ACTION NO. 3:14-CV-581-DW

CAROLYN W. COLVIN, Acting Commissioner of Social Security            DEFENDANT

## <u>MEMORANDUM OPINION</u>

Plaintiff Hanaa Khudhair has filed a complaint pursuant to 42 U.S.C. §405(g) to obtain

judicial review of a final decision of the Commissioner of Social Security that denied her

application for supplemental security income (SSI).  Khudhair applied for SSI on Feb. 17, 2012,

alleging that she was disabled as of Jan. 1, 2003, due to neck pain related to degenerative disk

disease of the cervical spine along with post-traumatic stress disorder, depression, and anxiety

(Tr. 32, 156, 177, 197).  The Commissioner denied Khudhair's claims on initial consideration

(Tr. 115-118) and on reconsideration (Tr. 122-24).  Khudhair requested a hearing before an

Administrative Law Judge (ALJ) (Tr. 126, 127-129).

ALJ D. Lyndell Pickett conducted a hearing in Louisville, Kentucky, on April 19, 2013

(Tr. 29-46).  Khudhair attended with her attorney, Trevor Smith (Tr. 29).  Khudhair and

vocational expert (VE) Tina Stambaugh testified at the hearing (Tr. 33-42, 42-46).  Following

the conclusion of the hearing, ALJ Pickett entered a hearing decision on May 17, 2013, that

found Khudhair is not disabled for the purposes of the Social Security Act (Tr. 19-25).

In his adverse decision, ALJ Pickett made the following findings:

1.     The claimant has not engaged in substantial gainful activity since Feb. 17, 2012,
       the alleged onset date (20 C.F.R. 416.971, *et seq.*).

2.     The claimant has the following severe impairments: affective disorder and anxiety
       disorder (20 C.F.R. 416.920(c)).

3.      The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. 416.920(d), 416.925 and 416.926).

4.      After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a full range of work in all exertional levels but with the following limitations:  low stress, routine and repetitive tasks with no strict production quotas in a task-oriented environment. The work involves occasional contact with supervisors and co-workers, and no contact with the general public.  It also involves occasional reaching overhead bilaterally and frequent, but not constant, handling, fingering and feeling with the left non-dominant hand.

5.      The claimant has no past relevant work (20 C.F.R. 416.965).

6.      The claimant was born on May 15, 1964, and was 47-years-old, which is defined as a younger individual age 18-49, on the date the application was filed (20 C.F.R. 416.963).

7.      The claimant is not able to communicate in English, and is considered in the same way as an individual who is illiterate in English (20 C.F.R. 416.964).

8.      Transferability of job skills is not an issue because the claimant does not have past relevant works (20 C.F.R. 416.968).

9.      Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 C.F.R. 416.969 and 416.969(a)).

10.     The claimant has not been under a disability, as defined in the Social Security Act, since Feb. 17, 2012, the date the application was filed (20 C.F.R. 416.920(g)).

Khudhair sought review of the hearing decision by the Appeals Council (Tr. 7-13, 14-15).  The

Appeals Council denied her request for review, finding no reason under the Rules to review ALJ

Pickett's decision (Tr. 1-6).  The present lawsuit followed.

**The Five-Step Sequential Evaluation Process.**

Disability is defined by law as being the inability to do substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of not less than 12 months. See, 20 CFR §§ 404.1505, 416.905(a). To determine whether a claimant for DIB or SSI benefits satisfies such definition, a 5-step evaluation process has been developed. 20 CFR §§ 404.1520, 916.920(a). At step 1, the Commissioner must determine whether the claimant is currently engaged in substantial gainful activity; if so, the Commissioner will find the claimant to be not disabled. See, 20 CFR §§ 404.1520(a)(4)(i), 416.920(a)(4)(ii), 416.971. *See, Dinkel v. Secretary*, 910 F2d, 315, 318 (6th Cir. 1990).

If the claimant is not working, then the Commissioner next must determine at step 2 of the evaluation process whether the claimant has a severe impairment or combination of severe impairments that significantly limit his or her ability to perform basic work activities. See 20 CFR §§ 404.1520(a)(4)(ii),  416.920(a)(4)(ii). If the impairments of the claimant are determined by the Commissioner to be non-severe, in other words, so slight that they could not result in a finding of disability irrespective of a claimant's vocational factors, then the claimant will be determined to be not disabled at step 2. *See, Higgs v. Bowen*, 880 F.2d 960, 962 (6th Cir. 1988); *Mowery v. Heckler*, 771 F.2d 966, 971-72 (6th Cir. 1985).

If the claimant has a severe impairment or impairments, then the Commissioner at step 3 of the process will determine whether such impairments are sufficiently serious to satisfy the listing of impairments found in Appendix 1 of Subpart B of Part 404 of the federal regulations. 20 CFR §§ 404.1520(A)(4)(iii), 416.920(a)(4)(iii) The claimant will be determined to be automatically disabled without consideration of his or her age, education or work experience if

the claimant's impairments are sufficiently severe to meet or equal the criteria of any impairment listed in the Appendix. *See*, *Lankford v. Sullivan*, 942 F.2d 301, 306 (6th Cir. 1991); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).

When the severity of the claimant's impairments does not meet or equal the listings, then the Commissioner must determine at step 4 whether the claimant retains the residual functional capacity (RFC) given his or her impairments to permit a return to any of his or her past relevant work. 20 CFR §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv). *See, Smith v. Secretary*, 893 F.2d 106, 109-110 (6th Cir. 1989). A claimant who retains the residual functional capacity, despite his or her severe impairments, to perform past relevant work is not disabled. 20 CFR §§ 404.1560(b)(3), 416.960(b)(3) The burden switches to the Commissioner at step 5 of the sequential evaluation process to establish that the claimant, who cannot return to his or her past relevant work, remains capable of performing alternative work in the national economy given his or her residual functional capacity, age, education and past relevant work experience. See, 20 CFR §§ 404.1520(a)(4)(v), 404.1560( c ), 416.920(a)(4)(v), 416.960( c ); *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994); *Herr v. Commissioner*, 203 F.3d 388, 391 (6th Cir. 1999). Collectively, the above disability evaluation analysis is commonly referred to as the "5-step sequential evaluation process."

**Standard of Review.**

Review of a decision of the Commissioner is governed by 42 U.S.C. § 405(g). The statute, and case law that interprets it, require a reviewing court to affirm the findings of the Commissioner if they are supported by substantial evidence and the Commissioner has employed the appropriate legal standard. *Walters v. Commissioner of Social Security*, 127 F.3d 525, 528

4

(6th Cir. 1997) ("This Court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.).  Substantial evidence is defined by the Supreme Court to be "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales,* 402 U.S. 389, 401 (1971).  *See also, Lashley v. Sec'y of HHS*, 708 F.2d 1048, 1053 (6th Cir. 1983) (citing *Perales*).  It is more than a mere scintilla of evidence or evidence that merely creates the suspicion of the existence of a fact, but must be enough evidence to justify a refusal to direct a verdict if the matter were tried to a jury. *Sias v. Sec'y of HHS*, 861 F.2d 475, 479 n. 1 (6th Cir. 1988).

The substantiality of the evidence is to be determined based upon a review of the record taken as a whole, not simply some evidence, but rather the entirety of the record to include those portions that detract from its weight.  *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984); *Laskowski v. Apfel*, 100 F. Supp.2d 474, 482 (E.D. Mich. 2000).  So long as the decision of the Commissioner is supported by substantial evidence, it must be upheld by the federal court even if the record might support a contrary conclusion.  *Smith v. Sec'y of HHS*, 893 F.2d 106, 108 (6th Cir. 1989).  The substantial evidence standard "presupposes that there is a zone of choice within which decision makers can go either way, without interference from the courts."  *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (*en banc*).


**Issues for Review.**

Plaintiff, Hanaa Khudhair, is a 50-year-old married woman, who emigrated with her husband and four of her five children from Iraq to the United States in 2011 (Tr. 32).  Since her arrival, Khudhair has sought treatment for anxiety, depression, memory difficulties, insomnia

5

and flashbacks, all related to post-traumatic distress disorder caused by her witnessing the murder of her parents and brother in Iraq in 1984 (Tr. 32, 34, 270). Khudhair has been treated for her psychiatric problems on five occasions by Dr. Paul Kensicki of the University of Louisville Psychiatric Associates (Tr. 224-245). Dr. Kensicki has offered his opinion that due to the symptoms associated with her PTSD Khudhair is disabled and unable to work (Tr. 224, 245, 274-75).

Khudhair testified at the hearing that her psychiatric problems, along with her neck and back pain, are her primary medical issues (Tr. 34). She related that her psychiatric problems with depression, anxiety and PTSD began after she witnessed the murder of her parents and brother during an incident in which she was shot as well (Id.). As a result, she experiences nightmares, flashbacks and anxiety attacks. These flashbacks and anxiety attacks occur approximately 3-4 times per week and last approximately an hour on each occasion (Tr. 35). She also experiences difficulty sleeping, problems with her memory and concentration that interfere with her ability to function in the home (Tr. 36-37). As a result, she isolates herself and avoids going out of her apartment. She does take medication for her psychiatric problems to calm her down and improve her memory (Tr. 37).

Khudhair also testified at the hearing that she suffers from pain in her neck that radiates to her shoulders and to both of her hands, which have problems gripping, especially her left hand. Khudhair explained that while her family was in Jordan after leaving Iraq she had hand surgery on her non-dominant left hand in 2008 without substantial benefit (Tr. 38). She now lives in an apartment with her four children and her husband, who is employed nearby at a hospital (Tr. 38). According to Khudhair, her husband and children perform most of the chores in the home (Tr. 39). Due to her memory problems, Khudhair does not want to use the

6

stove to cook.  Due to her nightly sleeping problems, Khudhair spends most of the day sleeping

in the family's apartment.  She does not drive an automobile nor does she grocery shop (Tr. 40).

In addition to treatment by Dr. Kensicki, Khudhair also received psychiatric treatment by Dr.

McCurdy on one occasion (Tr. 41-42).

Vocational expert Tina Stambaugh testified at the hearing that if Khudhair did in fact

suffer flashbacks on a daily basis that required 3-4 unscheduled breaks throughout the workday,

there would be no gainful employment available to her (Tr. 45).  Otherwise, assuming that she

had the residual functional capacity to perform routine, repetitive and unskilled work in a low

stress environment away from the general public with no production quotas and only occasional

contact with supervisors and co-workers, Khudhair would remain capable of performing

unskilled sedentary, light and medium exertional level jobs according to Stambaugh (Tr. 43-44).

Included among these jobs, according to Stambaugh, are such jobs as kitchen helper, laundry

worker, packer, food preparation worker and general factory helper (Id.).  Stambaugh added in

her testimony that assuming that Khudhair could only reach overhead occasionally and could

only perform frequent handling, fingering and feeling with the left, non-dominant hand, she still

would remain capable of performing all of the jobs previously identified by the vocational expert

(Tr. 44).

Khudhair in her fact and law summary now takes issue with findings of fact 2, 3, 4, 9 and

10 of ALJ Pickett's hearing decision (Tr. 21-25).  ALJ Pickett in finding no. 2 determined that

Khudhair's severe impairments included affective disorder and anxiety disorder, but found her

degenerative disk disease of the cervical spine, along with her hand and chest pain, to be non-

severe because they did not affect her ability to perform basic work-related activities (Tr. 21).  In

finding no. 3, ALJ Pickett found that her affective disorder and anxiety disorder did not satisfy

the "B" criteria of listings 12.04 and 12.06 because she did not exhibit the degree of functional limitation required by the listings.  ALJ Pickett found in this regard that Khudhair had only moderate limitation in her activities of daily living and social functioning, as well as moderate limitations in her ability to maintain concentration, persistence and pace, not marked limitation as required by the cited listings (Tr. 22).

In finding no. 4, ALJ Pickett determined that Khudhair had the residual functional capacity to perform work at all exertional levels with limitation to low stress, routine and repetitive tasks in work that involved only occasional contact with supervisors and co-workers and no contact with the general public along with only occasional reaching overhead bilaterally and frequent, but not constant, handling, fingering and feeling with the left non-dominant hand (Tr. 23).  Finding of fact no. 9 contains the ALJ's decision that Khudhair retains the residual functional capacity to perform jobs that exist in significant numbers in the national economy. Finding no. 10 is the ultimate conclusion that Khudhair has not been under a disability since Feb. 17, 2012, to the date of ALJ Pickett's decision on May 17, 2013 (Tr. 25).  Khudhair now challenges all of these findings as being unsupported by substantial evidence and contrary to law.

*Finding of Fact No. 2.*

Khudhair first argues that her neck problems were a severe impairment.  ALJ Pickett did acknowledge that x-rays of her cervical spine showed a loss of disk height with anterior osteophyte formation at the C5-6.  Khudhair claims that the ALJ failed to note her hearing testimony that she experiences neck pain at all times that radiates through both shoulders to her hands causing her to have reduced function in her hands (Tr. 38-39).  She complains that ALJ Pickett also did not take note of her emergency room visit of April 9, 2012, when Khudhair

complained of neck pain and was diagnosed with adult torticollis[1] (Tr. 220-223), which was treated with medications Ultram and Flexoril.

Khudhair also points to treatment notes from her emergency room visit of Jan. 28, 2013 (Tr. 249-58). On that occasion, she complained of intense headache pain combined with neck and shoulder pain, which she rated to be a level 8 on a 10-level scale (Tr. 251). Khudhair was diagnosed with cervical radiculopathy following the administration of an EKG and x-rays. Khudhair now insists that these treatment records and the objective imaging obtained from her various emergency room visits convincingly refutes the notion that her cervical disk disease was merely a "slight abnormality" that "minimally affected" her ability to perform work. *See, Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir. 1988); *Salmi v. Sec'y*, 774 F.2d 685, 691-93 (6th Cir. 1985).

In other words, she argues that these conditions are not the type of totally groundless claims that are intended to be screened out at step 2 of the sequential evaluation process in her view. *See, Farris v. Sec'y*, 773 F.2d 85, 89-90 (6th Cir. 1985). The same is true, according to her, of her complaints of chest pain that led to a separate emergency room visit in January of 2013 - - a visit that resulted in an abnormal EKG test result.

Khudhair bears the burden to demonstrate that she suffers from medically determinable physical impairments based on medical science and laboratory findings. *See, Watters v. Comm'r*, 2013 WL 3722099 at *2 (6th Cir. July 17, 2013) (citing SSR 96-4p, 1996 WL 374187 at*1). To meet this burden, Khudhair must show that she has an impairment that has lasted or is expected to last for a continuous period of at least 12 months and that the impairment significantly limits her ability to do basic work activities. *Harley v. Comm'r*, 485 Fed.Appx.

---

[1] Also known as cervical dystonia, torticollis "is a painful condition of the neck muscles, which contract involuntarily causing the head to twist or turn to one side." The disorder is relatively rare and occurs most often in middle aged women. See http://www.mayoclinic.org/diseases-conditions/spasmodic-torticollis (last visited May 5, 2015).

802, 803 (6th Cir. June 25, 2012) (citing 20 C.F.R. §§404.1509, 404.1521, 416.909, 416.921). As the Commissioner correctly notes, however, the mere diagnosis of a condition does not thereby establish its severity. *Higgs*, 880 F.2d at 863; SSR 96-8p, 1996 WL 374184 at *2-3 (1996) (The functional limitations caused by a claimant's impairment are what establishes the severity of those impairments at step 2).

Basic work activities are defined by federal regulation to include those abilities and aptitudes necessary to do most jobs such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying or handling, as well as understanding, carrying out and remembering simple instructions and responding appropriately to supervision, co-workers and usual work situations. See 20 C.F.R. §§404.1521(b), 416.921(b). *See, Helm v. Comm'r*, 405 Fed. Appx. 997, 1001 (6th Cir. Jan. 4, 2011) ("A claimant must do more than show that he is severely impaired. To support a finding of disability, the impairment must result in functional limitations.").'

The severity regulation at step 2 of the sequential evaluation process is considered in this circuit to be a "de minimis hurdle." *Rogers v. Comm'r*, 486 F.3d 234, n.2 (6th Cir. 2007). It is intended to "screen out totally groundless claims." *Farris v. Sec'y of HHS*, 773 F.2d 85, 89 (6th Cir. 1985). Consequently, if a claimant's impairment has more than a minimal effect on the ability of a claimant to do basic work activities, then the ALJ must treat the impairment as being severe. *Nejat v. Comm'r*, 359 Fed. Appx. 574, 576-77 (6th Cir. Dec. 22, 2009) (citing SSR 96-3p 1996 WL 374181 at *1 (1996)).

Once an ALJ makes a finding that even one of the impairments of a claimant is severe, then the ALJ "must consider limitations and restrictions imposed by all of the individual's impairments, even those that are not severe." Id. (citing SSR 96-8p, 1996 WL 374184 at *5). Accordingly, if the administrative law judge considers all of a claimant's impairments at the

10

remaining steps of the sequential evaluation process, the failure of the ALJ to include additional impairments as being "severe" at step 2 of the process "does not constitute reversible error." *Maziarz v. Sec'y of HHS*, 837 F.2d 240, 244 (6th Cir. 1987).

Here, the ALJ did not commit harmful error even if one were to assume that Khudhair's cervical disk disease, neck sprain and neck and shoulder tenderness adversely affected her ability to perform basic work activities under 20 C.F.R. §416.921(d).  This is so because the ALJ continued in his analysis to complete the 5-step sequential evaluation process based on his determination that Khudhair did have severe nonexertional impairments of affective disorder and anxiety disorder (Tr. 21).  *See, McGlothin v. Comm'r*, 229 Fed. Appx. 516, 522 (6th Cir. 2008).

The characterization of Khudhair's neck problems as being severe or non-severe became legally irrelevant when ALJ Pickett completed the 5-step evaluation process.  The Court disagrees with Khudhair to the extent that she now claims that ALJ Pickett failed to take into account her neck related cervical radiculopathy in his determination of her residual functional capacity in finding no. 4 of the hearing decision (Tr. 23-24).  To the contrary, ALJ Pickett expressly limited Khudhair to only "occasional overhead reaching and frequent, but not constant, handling, fingering and feeling with the left, non-dominant hand."  (Tr. 23).  This limitation confirms that the ALJ considered her cervical condition in his assessment of her residual functional capacity, along with her other non-severe impairments.  Accordingly, even were we to assume that such impairments themselves were severe, the failure of the ALJ to include them among the severe impairments at step 2 of the sequential evaluation process was merely harmless error.

*Finding of Fact No. 3*.

Khudhair next challenges the notion that her limitations due to PTSD, depression and anxiety do not satisfy the "B" criteria of listings 12.04 and 12.06 of the listing of impairments. ALJ Pickett determined at p. 4 of his hearing decision that Khudhair has only moderate limitations in her activities of daily living and moderate limitations in her ability to maintain concentration, persistence and pace (Tr. 22-23). This conclusion in Khudhair's view stands in direct contradiction to her testimony that she has experienced ongoing, chronic flashbacks, nightmares, anxiety and memory problems since she witnessed the murder of her parents and sibling (Tr. 34-36). These marked limitations on her ability to function are readily apparent from the administrative record according to Khudhair and warrant a thorough explanation by ALJ Pickett rather than merely "a boilerplate explanation" as to why she somehow does not meet the "B" criteria of the two listings. *See, Blacha v. Sec'y*, 927 F.2d 228, 230 (6th Cir. 1990); *King v. Heckler*, 742 F.2d 968, 975 (6th Cir. 1984).

At step three, a claimant will be considered to be disabled if his impairment meets or equals one of the listings of impairments found in 20 C.F.R. Part 404, Subpart P, App. 1. *McClellan v. Astrue*, 804 F. Supp.2 d 678 (E.D. Tenn. 2011). The burden falls on the claimant to prove every element of the applicable listing. *King v. Sec'y of H&HS*, 742 F.2d 968, 974 (6th Cir. 1986). When the claimant presents evidence of an impairment that meets or equals all of the requirements for a particular listed impairment, along with the 12-month duration requirement, a finding of disability is required without regard to the claimant's age, education or work history. *Lankford v. Sullivan*, 942 F.2d 301, 306 (6th Cir. 1991); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990); *see also, Sullivan v. Zebley*, 493 U.S. 521, 531-33 (1990) ("The Secretary [now Commissioner] explicitly has set the medical criteria defining the listing

impairments at a higher level of severity than the statutory standard.  The listings define impairments that would prevent an adult, regardless of his age, education, or work experience, from performing any gainful activity, not just 'substantial gainful activity.'") (citing 20 C.F.R. §416.925(a)(1989)); *Bowen v. City of New York*, 476 U.S. 467, 471 (1986) ("If a claimant's condition meets or equals the listed impairments, he is conclusively presumed to be disabled and entitled to benefits; if not, the process moves to the fourth step").

An impairment or combination of impairments will be deemed medically equivalent to a listed impairment if the symptoms, signs and laboratory findings demonstrated by the medical evidence are equivalent in severity and duration to that of a listed impairment.  *See Land v. Sec'y of H&HS*, 814 F.2d 241, 245 (6th Cir. 1986) (citing 20 C.F.R. §1526(b)).  A decision of medical equivalency, however, must be based solely on medical evidence supported by acceptable clinical and diagnostic techniques.  *Id.*  Finally, an ALJ is not required by Sixth Circuit case law to individually discuss each element of the record when considering the listings so long as the ALJ demonstrates that he has considered the totality of the record.  *Rosic v. Comm'r of Soc. Security*, 2010 WL 3292964 at *3 (N.D. Ohio Aug. 19, 2010) (citing *Gooch v. Sec'y of H&HS*, 833 F.2d 589, 591 (6th Cir. 1987)).

In order to establish disability due to the presence of a mental impairment on the basis of medical evidence alone, a claimant must satisfy the requirements of one of the nine listings for mental impairment contained in appendix 1.  *Abbott v. Sullivan*, 905 F.2d 918, 923-24 (6th Cir. 1990).  Most of these listings impose two requirements: first, that the claimant possess certain particular signs or symptoms; and second, that the symptoms result in a specified degree of functional limitation. *Id.*  The symptoms are generally found in paragraph A of each listing and, hence, are referred to as the "A criteria." The "functional limitations associated with mental

13

disorders which are incompatible with the ability to work," 20 C.F.R. Part 404, Subpt. P, App. 1

§ 12.00, are generally contained in paragraph B of the listings, and are the same for all relevant

disorders. *Id.*

The "B criteria" require, depending on the particular listing, that either two or three of the

following restrictions exist in order for disability to be found at this stage:

1. Marked restriction of activities of daily living; or
2. Marked difficulties in maintaining social functioning; or
3. Deficiencies of concentration, persistence or pace resulting in frequent failure to complete tasks in a timely manner (in work settings or elsewhere); or
4. Repeated episodes of deterioration or decompensation in work or work-like settings which cause the individual to withdraw from that situation or to experience exacerbation of signs and symptoms (which may include deterioration of adaptive behaviors).

20 C.F.R. Part 404, Subpt. P, App. 1 §§ 12.02B, 12.03B, 12.04B, 12.06B, 12.07B, 12.08B.

*Abbott v. Sullivan*, 905 F.2d 918, 923-24 (6th Cir. 1990)

Because the listings establish a presumption of disability without consideration of a

claimant's age, education or work experience, and represent an automatic "screening in" based

only on a claimant's medical findings, the claimant must meet the strict evidentiary standard

described above.   *Zebley*, 493 U.S at 532.  Khudhair has not satisfied this strict standard, as ALJ

Pickett correctly concludes in his hearing decision.

Review of the hearing decision persuades the Court that ALJ Pickett took into account all

of Khudhair's self-stated limitations during her hearing testimony.  All of the limitations related

to the B criteria are set forth at p. 4 of the hearing decision.  ALJ Pickett reflected Khudhair's

complaints of nightmares, isolation, sleeplessness, and memory loss.  Review of the remainder of

the hearing decision, however, reflects that he did not find Khudhair's testimony to be entirely

credible with respect to her stated limitations.  This conclusion is found at p. 5 of the hearing

decision, where in discussing residual functional capacity, ALJ Pickett expressly noted that "the

14

claimant's statements concerning the intensity, persistence and limiting effects of these symptoms [flashbacks, sleeplessness, memory problems] are not entirely credible." (Tr. 23). As support for this conclusion, the ALJ noted that Khudhair's overall care had been "highly conservative, largely sporadic and quite inconsistent with her allegations." (Id.). Thus, this credibility determination of the ALJ served in part for the basis of his determination that Khudhair did not show marked limitations in at least two of the B criteria.

The Court cannot hold this finding to be unsupported by substantial evidence. Review of the record indicates that minimal psychiatric treatment resulted in significant improvement in Khudhair's mental and emotional symptoms. In fact, as of March 8, 2013, approximately one month prior to the hearing and after only five visits to the U of L Psychiatric Clinic, she reported to Dr. McCurdy at the UL Psychiatric Clinic that she was "feeling good" and was "feeling better than last time." (Tr. 265). Khudhair reported to Dr. McCurdy that her sleep was "much improved." While she still experienced some anxiety in crowds and increased vigilance, Dr. McCurdy noted that "things are improved" if not fully resolved as Khudhair continued to claim memory issues and anxiety. Dr. McCurdy reported no side effects from her prescribed medications of Zoloft and Prazosin. (Id.).

On that occasion he noted Khudhair's appearance to be appropriate, her behavior cooperative, her speech normal, mood euthymic, thought process to be goal-directed, thought content logical, immediate and short-term memory to be intact with an adequate fund of knowledge, good insight and good judgment (Tr. 266). Dr. McCurdy then assessed Khudhair with a GAF score of 60 indicating only moderate restrictions in her functions, a conclusion entirely in keeping with ALJ Pickett's findings concerning the "B" criteria of the listings (Tr. 266).

15

Given the deference that credibility findings are entitled to in the federal courts, along with the obvious improvement in Khudhair's symptoms upon psychiatric treatment, the Court concludes that the finding of the ALJ at step 3 of the sequential evaluation process, that Khudhair does not have an impairment or combination of impairments that medically meet or equal either listing 12.-04 or listing 12.06 is supported by substantial evidence. *See, Thacker v. Social Security Admin,* 93 Fed. App'x. 725, 728 (6th Cir. Mar. 12, 2004)

*Finding of Fact No. 4.*

Khudhair next challenges the determination of ALJ Pickett that she remained capable of performing a full range of work at all exertional levels.  Khudhair argues that this RFC evaluation by the ALJ violates 20 C.F.R. §416.945(e) because it fails to take into account her abnormal cardiac findings.  In fact, according to Khudhair , the ALJ misstated the findings of her EKG, which was not normal, but rather abnormal (Tr. 22, 255).

Khudhair repeats that the ALJ failed to take into account her complaints of tenderness in the neck and shoulders, and complaints of arm and hand problems (Tr. 38-39, 251).  She again challenges the credibility finding of ALJ Pickett, who found her subjective complaints regarding her symptoms to be less than fully credible (Tr. 24).  Given the murder of her family in Iraq, Khudhair argues that a determination that she had only "moderate" emotional problems was not supported by substantial evidence as shown by the findings of her treating psychiatrist, Dr. Kensicki, who repeatedly reported Khudhair's symptoms of nightmares, sadness, withdrawal, flashbacks, sleep disturbance and avoidance (Tr. 229, 231-32, 233).  His observations resulted in a diagnosis of PTSD along with a GAF score of 50 (Tr. 227).  Further, Dr. Kensicki repeatedly

expressed his opinion that due to her PTSD symptoms, Khudhair was disabled and not able to perform the duties of work (Tr. 234).

Based upon the treatment records of Dr. Kensicki, Khudhair concludes that her testimony regarding her symptoms has been consistent throughout.  As a result, the adverse credibility finding of ALJ Pickett supposedly is not supported by substantial evidence.  In particular, Khudhair directly disputes the conclusion that her overall care had been "highly conservative, largely sporadic and quite inconsistent with her allegations."  To the contrary, the only reason that any gap in treatment occurred, according to her, is her lack of medical insurance or income, which under *Blankenship v. Bowen*, 874 F.2d 1116, 1123 (6th Cir. 1989) is not a valid basis to reject her credibility.

A claimant's residual functional capacity is the most that he or she can do despite his or her impairments.  *See, Franson v. Comm'r*, 556 F.Supp.2d 716, 731 (W.D. Mich. 2008) (citing 20 C.F.R. §404.1545(a)).  The formulation of a claimant's RFC is the responsibility of the ALJ. *Paul v. Astrue*, 827 F. Supp.2d 739, 745 (E.D. Ky. 2011).  In making this RFC determination the ALJ must consider all of the relevant medical and other evidence.  20 C.F.R. §404.1545(e).  See, *Hickey-Haynes v. Barnhart*, 116 Fed. Appx. 718, 726 (6th Cir. 2004) ("An RFC is the assessment of the claimant's maximum remaining capability to perform work-related activities despite the physical and mental impairments caused by his or her disability.") (citing SSR 96-8p).

In reaching an RFC determination, the ALJ is to assess the physical abilities, mental abilities, and other abilities affected by the impairments of the claimant to determine the total limiting effect of all such impairments, severe and non-severe.  *Dragon v. Comm'r*, 470 Fed. Appx. 454 at *9 (6th Cir. 2012).  The ALJ also may consider statements made by the claimant on

what he or she is able to do, as well as descriptions and observations of such limitations provided by the claimant's neighbors, friends or other persons.  20 C.F.R. §404.1545(a)(3).  An RFC finding by the ALJ is used to determine whether a claimant can perform his or her past relevant work at step 4 of the evaluation process, and whether the claimant can adjust to other work existing in the national economy at step 5.  *Eslinger v. Comm'r*, 476 Fed. Appx. 618 at **2-3 (6th Cir. 2012).

Khudhair's arguments that involve finding no. 4, the RFC finding, fall broadly into three categories.  Khudhair directly challenges the credibility finding of ALJ Pickett, who concluded that her testimony concerning her nonexertional limitations due to PTSD, anxiety and depression were not fully credible, as noted above.  Khudhair also challenges ALJ Pickett's characterization of her mental health treatment as being "conservative, sporadic and inconsistent with her allegations."  Finally, she maintains that the RFC determination of the ALJ fails to adequately take into account her physical limitations related to her neck and heart problems.

An administrative law judge properly may consider the credibility of a claimant when evaluating the claimant's subjective complaints, and the federal courts will accord "great deference to that credibility determination."  *Warner v. Comm'r*, 375 F.3d 387, 392 (6th Cir. 2004).  The findings of the ALJ in this regard are repeatedly held in the Sixth Circuit to be accorded great weight, and judicial deference will be given to the ability of the ALJ to observe the demeanor and credibility of the witnesses.  *Walters v. Comm'r*, 127 F.2d 525, 531 (6th Cir. 1997) (citing *Villarreal v. Sec'y*, 818 F.2d 461, 463 (6th Cir. 1987)).  Yet, the ALJ is not accorded absolute deference.  His or her assessment of a claimant's credibility must be supported by substantial evidence.  *Beavers v. Sec'y,* 577 F.2d 383, 386-87 (6th Cir. 1978).

When the ALJ "finds contradictions among the medical reports, claimant's testimony and other evidence," the ALJ may properly discount the credibility of the claimant. *Winning v. Comm'r*, 661 F. Supp.2d 807, 822 (N.D. Ohio 2009) (citing *Walters,* 127 F.3d 525, 531 (6th Cir. 1997)). The ALJ, however, is not permitted to render a credibility determination based solely upon a hunch, or "intangible or intuitive notion about an individual's credibility." Id. (citing Rogers, 486 F.3d at 247) (citing SSR 96-7p)). Under SSR 96-7p, the ALJ must in the hearing decision set forth specific reasons for the credibility determination sufficient to make clear to the claimant and subsequent reviewers the weight that the ALJ gave to the claimant's statements and the reasons for such weight. *Winning*, 661 F. Supp.2d at 823. A mere blanket assertion that a claimant is not believable will not be sufficient under SSR 96-7p. *Id*. (citing *Rogers,* 486 F.3d at 248).

An assessment of the claimant's credibility must be based on a consideration of all the evidence of record. It should include consideration of not only the objective medical evidence but the aforementioned factors of: (1) the daily activities of the claimant; (2) the location, duration, frequency, and intensity of the claimant's symptoms including pain; (3) any factors that precipitate or aggravate the symptoms; (4) the dosage, type, effectiveness and side effects of any medication taken to alleviate such symptoms or pain; (5) treatment that the claimant has received for relief of his or her symptoms; (6) any measures other than treatment that the claimant uses to relieve his or her symptoms; and (7) any other factors relating to the functional limitations and restrictions of the claimant due to such symptoms or pain. Id. at 823 n. 14 (citing SSR 96-7p).

Also included among the evidence that the ALJ must consider when making a credibility determination are the medical signs and laboratory findings of record, the diagnosis, prognosis and medical opinions provided by any treating physicians or other medical sources, and any

statements or reports from the claimant, physicians or other persons about the claimant's medical history, treatment, response to treatment, prior work record, daily activities and other information related to the symptoms of the claimant and how such symptoms affect his or her ability to work. Id.

When the record establishes consistency between the subjective complaints of the claimant and the other evidence of record, such consistency will tend to support the credibility of claimant, while in contrast, any inconsistency in this regard will tend to have the opposite effect. *Winning,* 661 F. Supp.2d at 823.  The reviewing court does not make its own credibility determinations.  *Franson v. Comm'r,* 556 F. Supp.2d 716, 726-27 (W.D. Mich. 2008) (citing Walters, 127 F.3d at 528)).  The federal courts will not substitute their own credibility determination for that of the ALJ as the fundamental task of the Commissioner is to "resolve conflicts in the evidence and to decide questions of credibility."  *Rineholt v. Astrue*, 617 F. Supp.2d 733, 742 (E.D. Tenn. 2009) (citing Felisky v. Bowen, 35 F.3d 1027, 1035 (6th Cir. 1994)).  Given the substantial deference accorded the credibility determination of the Commissioner, "'claimants challenging the ALJ's credibility determination face an uphill battle.'" *Franson*, 556 F. Supp.2d at 726-27 (citing *Daniels v. Comm'r*, 152 Fed. Appx. 485, 488 (6th Cir. 2005)).

Khudhair has not won this uphill battle.  Examination of the record is strongly supportive of ALJ Pickett's credibility determination as earlier noted.  Khudhair's medical treatment in its entirety consisted of only five visits to the UL Psychiatric Associates for treatment by Dr. Kensicki and Dr. McCurdy (Tr. 224-234, 235-244, 264-272).  While Dr. Kensicki did report that Khudhair demonstrated symptoms of PTSD, anxiety and depression, the doctor's own treatment records repeatedly reflect that she responded well to treatment, that her appearance was good, her

behavior appropriate, her memory intact, speech normal, thought content and process organized

and cooperative (Tr. 225, 227, 235, 236, 237, 268-69).  By March 12, 2012, Dr. Kensicki noted

that Khudhair's mental condition had improved and that while she still complained of

nightmares, she reported 50% less such incidents and that she was "able to sleep through them."

(Tr. 225).  The doctor's treatment notes also indicate that Khudhair was less anxious and

apprehensive as well.

By the following year, when Khudhair returned to be examined by Dr. McCurdy of the U

of L Psychiatric Group, she reported on March 8, 2013, that she was "feeling good" and was

"feeling better than last time."  (Tr. 265-266).  Dr. McCurdy's treatment notes reflect that her

sleep was "much improved" although she still reported some anxiety in crowds with increased

vigilance.  On the whole, Dr. McCurdy noted that "things are improved but not quite with a full

resolution."  (Tr. 265).  Further, the doctor in his treatment notes also observed that Khudhair

experienced no side effects from the medications Zoloft or Prazosin (Id.).  Accordingly, given

her relatively limited treatment and her marked improvement during such treatment, the ALJ did

not err when he determined that her care had been both conservative and inconsistent with her

allegations.

The Court further notes that some uncertainty exists concerning the date of occurrence of

the traumatic event – the murder of Khudhair's parents and brother - - that led to her PTSD

symptoms.  In the family and developmental history section of the psychiatric assessment

performed by Dr. McCurdy on Feb. 8, 2013 (Tr. 270), the treatment notes reflect that the murder

of Khudhair's parents and brother occurred in Baghdad, Iraq "when she was [approximately] 20

years old."  (Tr. 270).  Because Khudhair was born on May 15, 1964 (Tr. 225), the loss of her

family members, by her own statements, would have occurred sometime in the mid-1980s, or

approximately 20 years prior to the alleged onset date of Jan. 1, 2003 (Tr. 156), and

approximately 28 or more years prior to the date on which she applied for SSI on Feb. 17, 2012

(Tr. 156).  Thus, while there is no basis to dispute the occurrence of these tragic events, it

appears to the Court that they are more temporally remote than the arguments of the parties

would suggest.  It does not appear to the Court that the murders occurred "during the war," if the

parties are referring to events that occurred post-2003, when the United States invaded Iraq, but

rather approximately 20 years earlier by Khudhair's own report.

  Certain of the information provided by Khudhair in the disability report (Tr. 29-194)

likewise calls into question her testimony concerning the limitations caused by her

nonexertional, mental impairments.  For example, contrary to her testimony concerning her

isolation, Khudhair identified her friend, Faris Hussein (Tr. 189) as being "always in my house to

help me when my husband goes to work."  (Tr. 193).  Yet, in her hearing testimony, Khudhair

reported that she does not like to be around or to socialize with anybody and that she didn't mind

staying in her home for a week or two without seeing anyone (Tr. 36).  Thus, Khudhair's

statements in the disability report concerning her social interaction directly contradict her hearing

testimony on this point.

  Likewise, Khudhair reported in the same disability report that her husband had to shower

and bathe her (Tr. 193).  The medical treatment records, other than showing some cervical strain

and degenerative disk disease, contain no history of treatment for any physical limitations that

would preclude Khudhair from attending to her own personal needs, contrary to the

representation in her disability report (Tr. 193).  For these reasons, the Court concludes that the

credibility finding of ALJ Pickett is adequately supported in the record.

The Court turns next to the opinions of Dr. Kensicki. As noted, on various occasions Dr. Kensicki provided Khudhair with several briefly-worded statements indicating that Khudhair is disabled from work due to the symptoms of her PTSD, anxiety and depression (Tr. 224, 226, 245). In his first statement dated Feb. 10, 2012, Dr. Kensicki indicates that "Khudhair … recently began treatment with me for post-traumatic stress disorder stemming from her experiences in Iraq during the war." (Tr. 226).[2] In this first letter, Dr. Kensicki reported that Khudhair's symptoms are "severe and disabling…." (Tr. 226).

Three months later Dr. Kensicki on May 4, 2012, prepared a "return-to-work" form that identified Khudhair's illness as depression, and post-traumatic stress disorder (Tr. 224). In the comment section of the form the doctor wrote, "Iraqi refugee with PTSD – remains symptomatic with depressed mood, anxiety, nightmares, flashbacks, not able to work - - in need of continued treatment." (Id.). The final handwritten note from Dr. Kensicki is dated July 6, 2012. Dr Kensicki writes in this note that Khudhair is under his care with complaints of depression and post-traumatic stress disorder (Tr. 245). He continues to add that she has "multiple somatic complaints" adding that "she is disabled and unable to work." (Id.).

ALJ Pickett gave little weight to these opinions of Dr. Kensicki based on Khudhair's own minimal treatment history (Tr. 24). ALJ Pickett also rejected Dr. McCurdy's medical source statement - - mental (Tr. 274-75) in which the doctor determined that Khudhair had a poor ability to remember detailed instructions, concentrate for long periods, work near others without distraction, interact appropriately with the public, respond appropriately to changes in the work setting and to be aware of normal hazards in the workplace (Tr. 274-75). ALJ Pickett concluded

---

[2] As the Court has noted, Khudhair's traumatic experiences by her own statements apparently occurred in mid-1980s when she was approximately 20 years old, not during the more recent conflict in Iraq (Tr. 270).

with respect to Dr. McCurdy's opinion that his treatment notes and GAF score of 60 were inconsistent with the limitations imposed by McCurdy's medial source statement (Id.).

The question now is whether ALJ Pickett acted appropriately in rejecting the opinion of the two treating psychiatrists, Drs. Kensicki and McCurdy.  Under the treating physician rule, the Commissioner's regulations require that the ALJ will give a treating source's opinion controlling weight if it "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in your case record."  20 C.F.R. §§404.1527(d)(2), 416.927(d)(2).  *See, Cole v. Astrue*, 661 F.3d 931, 937-39 (6th Cir. 2011) (discussing the treating physician rule).  A physician will qualify as a treating source if the claimant sees the doctor "with a frequency consistent with accepted medical practice for the type of treatment/evaluation required for the medical condition."  *Smith v. Comm'r of Soc. Security*, 482 F.3d 873, 876 (6th Cir. 2007) (quoting 20 C.F.R. §404.1502).

The treating physician rule rests on the assumption that a medical professional who has dealt with a claimant over a long period of time for a specific illness will have a deeper insight into the medical condition of the claimant than an individual who may have examined the claimant only once or has merely seen the medical records of the claimant.  *Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir. 1994) (citing *Bowman v. Heckler*, 70 F.2d 564, 568 (5th Cir. 1983)).  The opinion of a treating source need not be given complete deference, however, if that opinion lacks objective support in the record, is in tension with a prior opinion of the same treating source, lacks meaningful detail, is entirely conclusory, or is in conflict with other evidence of record showing substantial improvement in the claimant's condition.  *See, White v. Comm'r*, 572 F.3d 272, 285-87 (6th Cir. 2009); *Calvert v. Firstar Financial, Inc.*, 409 F.3d 286, 294 (6th Cir.

24

2005); *Walters v. Comm'r*, 127 F.3d 525, 530 (6th Cir. 1997); *Cutlip v. Sec'y*, 25 F.3d 284 (6th Cir. 1994).

Even in those circumstances in which the Commissioner does not give the opinion of a treating physician controlling weight, it may still be given great weight.  *White,* 572 F.3d at 286 (citing SSR 96-2p).  When an ALJ declines to give controlling weight to the opinion of a treating source, the ALJ must balance a number of factors to evaluate what weight the opinion should be given.  Wilson, 378 F.3d at 544.  These factors include the length of the treatment relationship, frequency of examination, the nature and extent of the treatment provided, the supportability of the opinion, the consistency of the opinion with the record as a whole, and the specialization of the treating source.  *Cole,* 661 F.3d at 937 (citing 20 C.F.R. §404.1527(d)(2)).

Here, the Court concludes upon review that ALJ Pickett properly declined to give controlling weight, or great weight, to the opinions of the two treating psychiatrists.  First, the opinions lack support in the record in the sense that the treatment notes of both doctors show significant improvement of Khudhair's symptoms with relatively modest treatment.  Second, the written opinions of Dr. Kensicki lack meaningful detail and were all conclusory in nature as well as being in conflict with his own treatment notes.  To the extent that Dr. Kensicki offered the opinion that Khudhair is "disabled" or "unable to maintain gainful employment," such opinions are not subject to the treating physician rule, which expressly reserves such conclusions to the Commissioner.  *See, Bass v. McMahon*, 499 F.3d 506, 511 (6th Cir. 2007) ("20 C.F.R. §404.1527(e)(1) explicitly states that the conclusion of disability is reserved to the [Commissioner] … §(e)(3) further elaborates that no special significance will be given to opinions of disability, even if they come from a treating physician.").  Accordingly, Dr. Kensicki's opinion in that regard that Khudhair is disabled or is unable to work is merely a legal

25

conclusion that is not entitled to any special deference from the Commissioner. *See, Stanley v. Sec'y*, 39 F.3d 115, 118 (6th Cir. 1984) (Commissioner may properly reject a treating physician's unexplained opinion that a claimant is disabled); *Casey v. Sullivan*, 987 F.2d 1230, 1234-35 (6th Cir. 1993) (the opinion of a treating physician that a claimant is unemployable is not the equivalent of a determination of disability).

As for the medical source statement of ability to do work related activities (mental) prepared by Dr. McCurdy (Tr. 274-75), it appears to the Court that the limitations determined by Dr. McCurdy have been taken into account in the RFC determination of ALJ Pickett.  ALJ Pickett limited Khudhair to routine repetitive tasks in a low stress environment with only occasional contact with supervisors and co-workers and no contact with the general public. These limitations directly take into account the source statement prepared by Dr. McCurdy who only determined that Khudhair had no useful ability to carry out detailed instructions or to maintain concentration for extended periods or to interact appropriately with the public - - all of which are taken into account by the RFC finding in finding no. 4 (Tr. 23-24).

It therefore appears that ALJ Pickett did not fail to evaluate the opinions of the treating physicians as Khudhair now maintains.  Rather, the ALJ provided good reasons for rejecting such opinions that included the treatment notes of the very physicians who offered them.  For these reasons, the Court sees no violation of the treating physician rule.

The only remaining argument as to this particular finding is that ALJ Pickett failed to take into account the exertional limitations imposed by her cervical degenerative disk disease and abnormal EKG.  Examination of the hearing opinion reveals that ALJ Pickett did discuss Khudhair's neck and upper extremity pain (Tr. 23-24).  Specifically, he noted the absence of any treatment for hand pain along with little objective evidence to support her complaints of

debilitating pain.  At most, diagnostic imaging of the cervical spine revealed only relatively modest degenerative changes at the C5-6 along with soft tissue calcification in the posterior lower neck without any acute abnormality (Id.).

Examination of the cervical spine on Jan. 28, 2013, revealed that the cervical bodies maintained a normal height and alignment without any acute fracture (Tr. 256).  Only some chronic calcifications were seen at the posterior neck soft tissue at the C5 and C6 levels with moderate degenerative loss of disk height and osteoformation at the C5-C6 being noted (Id.).  In sum, no acute abnormality was observed.

Likewise, a CT of the head performed on the same date revealed no acute intercranial findings with no hemorrhage, lesions, or masses being visualized (Tr. 257).  The treatment records of Jewish Medical Center East dated April 9, 2012, when Khudhair appeared with complaints of neck pain, reveal only a diagnosis of adult torticollis (Tr. 222), a form of neck muscle involuntary contraction that was treated with Ultram 50 mg. and Flexoril 10 mg. (Tr. 221-222).

Khudhair returned to Jewish Medical Center East the following year on Jan. 28, 2013, again with complaints of headache and associated neck pain.  Physical examination of the neck on that occasion, however, indicates that Khudhair's neck was supple and that she had a normal range of motion in the upper extremities along with a normal neurological exam (Tr. 249-50).  Khudhair was diagnosed with cervical disk disease along with cervical radiculopathy (Tr. 251).  Treatment consisted of medication with Vicodin 500 mg. and Motrin 800 mg. (Tr. 251).  Accordingly, Khudhair limited treatment history, the absence of severe objective diagnostic imagery and treatment with moderate pain medication all are supportive of ALJ Pickett's RFC determination.  Further, the Court notes in this regard that the RFC determination of ALJ Pickett

includes limitations from more than occasional overhead reaching bilaterally and frequent handling, fingering and feeling with the left, nondominant hand, the hand that Khudhair indicated was the most involved in her radicular pain.  The ALJ therefore took into account the totality of Khudhair's symptoms related to her cervical degenerative disk disease condition in his decision.  The Court finds no error in this regard.


*Finding of Fact No. 9*

The final portion of Khudhair's fact and law summary contains a passing objection to findings of fact 9 and 10 of ALJ Pickett's hearing decision (Tr. 24-25).  The former finding contains ALJ Pickett's determination at step 5 of the sequential evaluation process that given Khudhair's age, education and residual functional capacity there remain significant numbers of jobs that she is capable of performing at various exertional levels in the national economy.  In reaching this conclusion, ALJ Pickett relied directly upon the hearing testimony of vocational expert Tina Stambaugh (Tr. 42-45).

Based on ALJ Pickett's first hypothetical, which assumed a capacity to perform routine, repetitive, unskilled, low stress work away from the public in a task oriented environment, Stambaugh identified a substantial number of such jobs capable of being performed at the sedentary, light and medium exertional levels (Id.).  Among the jobs identified were kitchen helper, laundry worker, packer, food preparation worker, general factory helper, hand packer, inspector and sorter (Tr. 43-44).  Assuming that Khudhair also was limited to only occasional overhead reaching bilaterally, Stambaugh testified that the same alternative jobs were capable of being performed by her (Tr. 44).

The testimony of a vocational expert may be substantial evidence to support the decision of the ALJ if that testimony is made in response to a hypothetical question that accurately portrays the mental and physical impairments of the claimant. *Ealy v. Comm'r*, 594 F.3d 504, 512-13 (6th Cir. 2010) (citing *Varley v. Sec'y*, 820 F.2d 777, 779 (6th Cir. 1987)). The hypothetical question to the VE is not required to include a list of all the claimant's medical conditions. *Wadd v. Comm'r*, 368 F.3d 629, 632-33 (6th Cir. 2004). The hypothetical question also need not incorporate those limitations asserted by the claimant that are properly rejected by the ALJ based on his independent review of the record. *Foster v. Halter*, 279 F.3d 348, 356-57 (6th Cir. 2002). The ALJ also may present a hypothetical to the VE on the basis of the ALJ's assessment of the claimant's credibility. *Jones v. Comm'r*, 336 F.3d 469, 475-76 (6th Cir. 2003) (citing *Townsend v. Sec'y*, 762 F.2d 40, 44 (6th Cir. 1985)). Nevertheless, if the hypothetical to the VE does not accurately portray the claimant's physical and mental limitations, the testimony of the VE will not be substantial evidence to support the Commissioner's decision. *Ealy,* 594 F.3d at 512-13.

Because the hypothetical question offered by ALJ Pickett to VE Stambaugh accurately reflected Khudhair's mental and physical limitations, the Commissioner carried the burden at step 5 of the sequential evaluation process. Accordingly, the decision of the Commissioner shall be affirmed and the complaint dismissed by separate judgment.

Cc:     Counsel of Record